**In the Matter of the Honorable Fredrick R. SPENCER, Judge of the Madison Circuit Court.**

No. 48S00–0210–JD–514.

Supreme Court of Indiana.

Nov. 7, 2003.

James H. Voyles, Dennis E. Zahn, Indianapolis, IN, Attorneys for Respondent.

Meg W. Babcock, Indianapolis, IN, Attorney for Commission.

JUDICIAL DISCIPLINARY ACTION

PER CURIAM.

### Introduction

This matter comes before the Court as a result of a judicial disciplinary action brought by the Indiana Commission on Judicial Qualifications ("Commission") against the Respondent herein, Fredrick R. Spencer, Judge of the Madison Circuit Court. Article 7, Section 4 of the Indiana Constitution and Indiana Admission and Discipline Rule 25 give the Indiana Supreme Court original jurisdiction over this matter.

The Commission charged Respondent with violating various provisions of the Code of Judicial Conduct in connection with his handling of a request for a special prosecutor in Madison County.

The matter was tried before three Indiana trial court judges appointed to serve as masters in the proceeding. Following the trial, the masters filed their report of findings with this Court, as provided by Admission and Discipline Rule 25(VIII)(N)(1). The Commission filed its recommendation and the Respondent filed a petition seeking review.

The matter having been tried, fully briefed, and reviewed by this Court, we now adopt the fact-finding and conclusions

of the masters. We also concur in their determination that Respondent committed judicial misconduct and in their recommendation as to the appropriate sanction that should be imposed.

### Factual Background

In the evening hours of November 2, 2001, ten teenage boys placed several homemade non-incendiary explosive devices outside the residence of John Doe [1] in Anderson, Indiana. With few exceptions, the devices exploded. Loud gunshot-like bangs were heard inside the residence by Doe's fourteen-year-old stepson and a friend. No property damage or injuries occurred as a result of the explosions.

The placement of the explosive devices outside the Doe residence was apparently motivated by ongoing hostilities between some of the teenage boys and Doe's stepson. Over the preceding eighteen months, these hostilities had included a fistfight and repeated "eggings" of the Doe residence.

The non-incendiary devices used by the youths are commonly referred to as "poppers." Though capable of causing serious injury to those caught in the explosive spray, they do not meet the technical definition of a "bomb," according to the testimony of both Thomas Hay, an Anderson police officer, and Gregory Belt, an Indiana State Police Detective certified by the F.B.I. as a bomb technician.

The following morning, Doe learned of the explosive sounds heard the prior evening. He walked his property and located the remains of exploded containers and a couple of intact two liter bottles near his propane tank. His concerns prompted him to notify the Anderson Fire Department. An investigation by the Fire De-

---

**1.** John Doe is not the person's real name. We have elected to obscure or omit the names of the juveniles and their parents involved in this matter.

partment and Anderson Police Department began.

The police investigation resulted in the identification of ten juvenile suspects. One of the juveniles admitted guilt but the investigation otherwise proceeded slowly. Around December 1, 2001, a detective with the Madison County Sheriff's Department related his concerns that the investigation was lagging to Anderson Chief of Police Edward Leonard. A few days later, Chief Leonard replaced the police officer assigned to the case with a different detective. The newly assigned detective initiated telephone contacts with Doe and with the parents of the various juvenile suspects. However, vacation schedules, the intervening holiday season, and the number of people to be interviewed precluded him from a concerned pursuit of the investigation until January of 2002.

The year 2002 was also an election year for various Madison County offices. Among the offices up for election that year were various Madison County judgeships, the office of Prosecuting Attorney, and the state representative seat for House District 36. The office of Madison County Circuit Court judge occupied by Respondent was not subject to election in 2002.

Rodney Cummings, the incumbent and Republican prosecutor for Madison County, first learned of the Doe incident and investigation sometime in mid to late January of 2002 when two detectives from the Anderson Police Department contacted him about the matter. Cummings was concerned that the case was not going to be vigorously pursued by the police. On January 31, 2002, he instructed one of his deputy prosecuting attorneys to investigate the perceived delay in the filing of charges against the juvenile suspects involved in the Doe incident.

The following morning, the Anderson Herald–Bulletin, the local newspaper in

Anderson, carried a front-page story on the investigation into the Doe matter under the banner headline: "Prosecutor probes APD." The opening paragraph of the article stated that Prosecutor Cummings' probe was prompted by concerns that the incident at the Doe residence was covered up for political reasons. The article also stated that the juvenile suspects included the sons of three Democratic politicians, one of whom was a political opponent of Cummings in the election for Madison County Prosecutor. Chief of Police Leonard was quoted as challenging Cummings' suggestion that a cover-up had occurred within the police department, stating that "the prosecutor has some wrong assumptions."

That same February 1, the deputy prosecutor assigned the day before to investigate the Doe incident issued a memorandum to Cummings. The deputy prosecutor's memorandum included five main points. First, he concluded there was no evidence of any overt acts by parents of the juvenile suspects to obstruct justice. Second, he suggested that a public appearance of impropriety existed as a result of the relationship of the parties, the reassignment of the police investigation at a time when the detective who had handled the investigation had nearly completed his work, and the delay in the submission of the case for prosecutorial review notwithstanding the admission of guilt that had already been obtained. Third, the deputy prosecutor recommended that the matter be referred to the Madison County judge with juvenile jurisdiction, the Honorable Jack Brinkman, of Madison Superior Court Two. Fourth, he recommended that waiver of the children to adult court should not be considered. Finally, the deputy prosecutor recommended that because of the political involvement of some of the parents, a special prosecu-

tor should be appointed if any of the parents so desired.

The following day, February 2, the Herald–Bulletin ran a front-page story on the prosecutor's investigation of the police department's work under the headline "Prosecutor finds no wrongdoing." The article stated Cummings' belief that two weeks was a reasonable time period for the police department to complete its work and turn the case over to the prosecutor's office. The article again identified three of the juvenile suspects as sons of local Democratic politicians. The article also included the following paragraph:

One recommendation [of the deputy prosecutor's investigation] is that if requested by the parents, a special prosecutor be appointed. Cummings said he would have no problem with appointing a special prosecutor.

In a companion story appearing in the Herald–Bulletin that same day under the headline "Mayor Lawler blasts prosecutor's police probe," Anderson Mayor J. Mark Lawler defended the integrity of the Anderson Police Department and criticized Prosecutor Cummings' investigation of the department as "grandstanding" and "politically motivated." Mayor Lawler noted the investigation had been commenced by Cummings on the same day the father of one of the suspects announced his candidacy for prosecutor against Cummings.

Through March of 2002, the Doe incident of November 2, 2001 and its permutations were repeatedly played out on the pages of the Herald–Bulletin. The numerous newspaper clippings admitted into evidence and the testimony of witnesses establish that the subject had become a very contentious political matter and the focus of significant public attention in the Anderson and Madison County area. In sum, the evidence established a growing public loss of confidence in the political and justice systems in Madison County as a result of the handling of the Doe incident.

On Thursday, March 7, 2002, the main front page article of the Herald–Bulletin ran under the headline "Charges to be filed in [Doe] bombing." The lead paragraph stated, "Prosecutors expect to file juvenile felony charges this week against eight of the ten boys suspected of placing explosive devices around the residence of [John Doe]." The article included a rehash of the Doe incident and a report of the charges Cummings intended to file against the juveniles. According to the article, Cummings stated that the charges would be filed in Madison Superior Court Two.

Anderson attorney John E. Eisele was retained by the parents of two of the juveniles alleged to be involved in the Doe incident. Those clients did not include the three Democratic politicians whose sons were suspects. After reading the March 7 article in the Herald–Bulletin, Eisele was concerned that the young men he represented were in serious trouble. Eisele's view was that Cummings was using the incident for political gain. That same afternoon, he filed a "Verified Petition for Appointment of a Special Prosecutor and Request for Issuance of Temporary Restraining Order" in the Madison Circuit Court.

Eisele's petition cited to Indiana Code § 33–14–1–6, the statute governing the appointment of special prosecutors. The petition also contained the following allegations in support of his request that a special prosecutor be appointed:

3. That several of the juveniles under such investigation and/or their parents are acquaintances of the said [Rodney J. Cummings] elected Prosecutor.

4. That one of the juveniles being investigated is the son of the former politi-

cal opponent of the said elected Prosecutor.

5. That one of the juveniles is the son of the former political opponent of the Prosecutor and he is a member of the Madison County Council. He is also an attorney practicing law in Madison County.

6. That a third juvenile being investigated has a father who is a practicing Madison County attorney. His mother will be a candidate for public office in the upcoming fall election and she is also a member of the opposite political party of the Prosecutor.

\* \* \*

10. That the Prosecutor has previously stated as reported by the Herald–Bulletin, on February 2, 2002 that if a Special Prosecutor is requested, that he would not object to the appointment of said Special Prosecutor.

An express reference to Prosecutor Cummings' intent to file charges against the juveniles and the Herald–Bulletin's story in its edition for that day was included in paragraph 13 of the petition.

Respondent, a Democrat with approximately nineteen years of experience as Madison Circuit Court Judge, was presiding on March 7, 2002 when the petition was filed. Attorney Eisele did not personally deliver the petition to the court nor did he speak with Respondent about the petition prior to the filing. Eisele also did not provide notice or service of the petition to Prosecutor Cummings.

Within minutes after it was filed, the clerk's office presented the Eisele petition to Respondent. After receiving the petition, Respondent placed a telephone call to the Indiana Judicial Center and spoke with a staff attorney. The staff attorney's notes indicate Respondent inquired as to the need for a hearing on the petition before him. The staff attorney provided Respondent with the citation to Indiana Code § 33–14–1–6, the statute governing the appointment of special prosecutors. As noted above, that citation had already been expressly set forth in the petition filed by Eisele but, according to Respondent, must have been overlooked by him. That code provision provides, in relevant part, that a circuit or superior court judge:

(1) shall appoint a special prosecutor if: (A) any person other than the prosecuting attorney or the prosecuting attorney's deputy files a verified petition requesting the appointment of a special prosecutor; and (B) the prosecuting attorney agrees that a special prosecutor is needed;

(2) may appoint a special prosecutor if: (A) a person files a verified petition requesting the appointment of a special prosecutor; and (B) the court, after: (i) notice is given to the prosecuting attorney; and (ii) an evidentiary hearing is conducted at which the prosecuting attorney is given an opportunity to be heard; finds by clear and convincing evidence that the appointment is necessary to avoid an actual conflict of interest or there is probably cause to believe the prosecutor has committed a crime. . . .

Ind.Code S 33–14–1–6(a), (b)(1) and (b)(2).

Without a hearing, without attempting to contact Prosecutor Cummings to notify him of the pending petition, and without confirmation or acceptance by the person Respondent had in mind, Respondent decided to appoint Joe Koenig, the Bartholomew County prosecutor, as special prosecutor. He placed a telephone call to Koenig's office and left a message at 2:38 p.m. on March 7, 2002, indicating his desire to appoint Koenig as special prosecutor. Respondent requested that Koenig

return his call. Prosecutor Koenig did so later that afternoon but was unable to reach Respondent.

Respondent filled in the name of "Joe Koenig" of "Bartholomew" County on the prepared order form and signed the "Order Appointing Special Prosecutor," making Koenig special prosecutor for purposes of investigating the allegations and evidence concerning the Doe incident. At the time Respondent issued the order, no charges had been filed in any court against any of the juveniles with respect to the Doe incident.

As of March 7, 2002, Respondent had never met Prosecutor Koenig. Respondent testified he chose Koenig because he had heard Koenig was a fair and impartial person and that he was unaware that Koenig and Cummings had a poor relationship. Cummings indicated he had a tense relationship with Joe Koenig that stemmed from Koenig's friendship with William Lawler, the long-time prosecutor of Madison County whom Cummings had defeated in 1994.

Respondent conceded that he had probably read the article in the Herald–Bulletin published that morning and, as a citizen who held a home subscription to the newspaper, was aware of the ongoing controversy revolving around the Doe incident. However, there is no evidence suggesting that Respondent was contacted or engaged in discussions with any attorneys, law enforcement officers or parents of juvenile suspects concerning the Doe incident. Similarly, there is no evidence establishing Respondent was, by reason of any personal, political or professional relationship with any parents or juveniles, motivated to act in their particular behalf to assist in obtaining a favorable disposition of the juvenile charges.

Respondent testified that inasmuch as Prosecutor Cummings had publicly indicat-

ed he would have "no problem" with the appointment of a special prosecutor if one was requested, it was his opinion on March 7, 2002 that it was not necessary to hold a hearing on the petition filed by Eisele. For that reason, Respondent explained, he attached to the order appointing the special prosecutor a copy of the February 2, 2002 article in which Cummings had made the statement indicating he would have no problem with the appointment of a special prosecutor. Respondent testified that, as it so happened, he located a copy of the article in his office that day.

At the close of the workday on March 7, Respondent personally delivered a copy of his "Order Appointing Special Prosecutor" to the offices of the Herald–Bulletin. He left it there with instructions to bring the order to the attention of one of the reporters who had been covering the Doe incident. Later that evening, the reporter called both Respondent and Prosecutor Cummings and spoke with them regarding the appointment. Cummings learned of the Koenig appointment through this telephone call.

Respondent testified he delivered a copy of his order to the Herald–Bulletin for two reasons. First, he hoped a story on the appointment would help calm the Anderson community. Second, he hoped to preclude the renewal of his prior debates with Cummings about whether Cummings, as prosecutor, was entitled to have a say in who was appointed as special prosecutor. Respondent and Prosecutor Cummings had vigorously clashed on prior occasions concerning special prosecutor appointments. Respondent testified that Cummings "had a fit" and was "outspoken, rude and abusive" regarding the Respondent's prior appointment of John Whiteleather of Whitley County in a different politically sensitive matter.

The March 8, 2002 edition of the Herald–Bulletin carried the story of the special prosecutor appointment order on page one under the headline, "Cummings bumped from bombing case." That story featured comments and quotes attributed to various of the main people involved, including both Respondent and Prosecutor Cummings. In the article, Respondent is cited as saying he had contacted the Indiana Judicial Center and "was told if the prosecutor requests appointment of a special prosecutor no hearing is needed." Respondent is further quoted as stating that while there should be a hearing, the prosecutor had already indicated in the newspaper that he was not opposed to the appointment of a special prosecutor. Cummings is cited as saying he would challenge or ignore the appointment because, according to Cummings, Respondent lacked jurisdiction to issue the order and was engaged in a politically-motivated "effort to manipulate the outcome in a favorable way."

Meanwhile, on March 8, Joe Koenig began receiving telephone calls regarding his appointment. Koenig determined he lacked the time to take on the responsibility and informed Respondent by telephone that he would be unable to serve as special prosecutor. That same day, Prosecutor Cummings filed a "Motion to Rescind Order for Appointment of Special Prosecutor" in the Madison County Circuit Court which, among other things, contained allegations that Respondent and attorney John Eisele had violated their professional ethical obligations.

On March 9, the Indianapolis Star joined the Herald–Bulletin in reporting Prosecutor Cummings' challenge to Respondent's appointment of a special prosecutor. In those stories, Cummings indicated his willingness to agree that a special prosecutor was necessary to handle the charges against the sons of the prominent Madison County Democrats, but stated that there is no basis for requesting a special prosecutor to handle the charges against the other juveniles alleged to be involved. Cummings added, "The filing was made in Circuit Court because he [Eisele] clearly wanted to find a judge that would issue an order favorable to his views." The Herald–Bulletin also continued its coverage of the appointment controversy.

On March 13, Cummings sent a letter to the Commission detailing his various complaints concerning Respondent's role in the appointment of special prosecutor Koenig. That same day, Cummings called Eisele and another attorney and requested that they come to his office for a meeting concerning the special prosecutor issues which were now set for hearing on March 15.

The meeting convened and, after indicating he had done well "politically" with the issue, Cummings informed them he was now willing to agree to the appointment of a special prosecutor. The attorneys engaged in a discussion of potential special prosecutors. Cummings, whose continuing concern had been the identity of the special prosecutor appointed, rejected various prosecutors proposed by the attorneys. Ultimately, an agreement was reached and on the following day, March 14, a "Stipulation of Appointment of Special Prosecutor" was filed. The stipulation provided that Respondent appoint David Kolger, the Wayne County Prosecuting Attorney, as special prosecutor for all of the juveniles involved in the Doe incident. The stipulation was presented by the attorneys to Respondent in his office that same date and, without hearing, was approved and made the order of the court.

Indiana Code 33–5–33.1–4 provides that "original and exclusive juvenile jurisdiction" is vested in the Superior Court of Madison County. The Madison Superior

Courts exist as a unified court system pursuant to local rule which provides that Madison Superior Court Two exercises jurisdiction over juvenile proceedings within the county. The Honorable Jack Brinkman, presiding judge of Madison Superior Court Two, was a candidate for re-election in 2002. Judge Brinkman was running on the Democratic ticket with the parents of two of the juveniles involved in the Doe incident. For that reason, Judge Brinkman testified, had a petition for special prosecutor for the Doe incident been filed in his court, it would have been necessary for him to recuse himself from entertaining that petition.

Ultimately, when the charges against the juveniles involved in the Doe incident were filed in his court, Judge Brinkman entered a recusal order and certified the appointment of a successor judge to the Indiana Supreme Court. We appointed the Honorable Michael D. Peyton of Henry Superior Court Two to serve as special judge in the juvenile proceedings. Eight of the ten juveniles involved in the Doe incident were subjected to a program of informal adjustment, as an alternative to the filing of a formal delinquency petition. In connection with that program, the eight juveniles were required to perform community service work, write a paper on the subject of their conduct and a letter of apology, and pay certain fees.

### Findings With Regard to the Charged Misconduct

As a preliminary matter, we note the Commission charged Respondent with improperly exercising jurisdiction over the request for a special prosecutor in the first instance, contending Respondent violated Indiana Code § 33–5–33.1–4 or Madison County's local rule, which provided that jurisdiction over juvenile proceedings was vested in Madison Superior Court Two.

The masters concluded that the Commission failed to prove Respondent committed judicial misconduct in connection with exercising initial jurisdiction over the petition for appointment of a special prosecutor. We agree. Whether original jurisdiction properly was in the Madison Circuit Court or in Madison Superior Two is a question we need not address. It is enough for the purposes of this proceeding to state that the question of subject matter jurisdiction was sufficiently debatable to foreclose any claim that Respondent's initial exercise of jurisdiction was an act of judicial misconduct.

As to the remaining charges, the masters concluded the Commission proved its case by clear and convincing evidence, and we again agree.

 Respondent violated the provisions of Canon 2(A) of the Indiana Code of Judicial Conduct that require judges to respect and comply with the law. Respondent's issuance of the "Order Appointing Special Prosecutor" on March 7, 2002 without providing the prosecutor with the opportunity to be heard on the petition did not comply with Indiana Code § 33–14–1–6. A hearing on a petition for appointment of a special prosecutor is required unless, pursuant to Indiana Code § 33–14–1–6(b)(1)(B), "The prosecuting attorney agrees that a special prosecutor is needed." The statement attributed to Prosecutor Cummings in the February 2, 2002 edition of the Herald–Bulletin did not provide a proper basis for Respondent to act with respect to the petition for appointment of a special prosecutor because the information was gained independently and from outside the record before him.

 Respondent violated the provisions of Judicial Canon 2(B) that prohibit judges from allowing family, social, political, or other relationships to influence the judge's judicial conduct. Respondent allowed his

relationship with Prosecutor Cummings to influence his judicial conduct, thereby depriving Cummings of his right to the hearing required by Indiana Code § 33–14–1–6.

■ Respondent violated the provisions of Canon 3(B)(2) that prohibit a judge from being swayed by partisan interests or public clamor. Respondent's issuance of the "Order Appointing Special Prosecutor" in an immediate and *ex parte* manner, coupled with his knowledge of the existing public controversy concerning the Doe incident and his subsequent delivery of the order to the Anderson Herald–Bulletin, establish he failed to discharge his adjudicative responsibilities without consideration for that public clamor or controversy.

■ Respondent's conduct also violated provisions of Canons 2(A) (requiring a judge to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 3(B)(8) (requiring a judge to accord every person who has a legal interest in a proceeding the right to be heard according to law), and 3(B)(9) (requiring a judge to dispose of all judicial matters fairly).

Others may also have contributed to the growing public skepticism about the operation of the justice system in Madison County as a result of the events following the Doe incident. But Respondent's actions on March 7, 2002, in considering and granting the petition for appointment of a special prosecutor without notice, together with his subsequent delivery of that order to the Herald–Bulletin, added questions about the independence of the judiciary to the public debate. In circumstances where significant public attention was already focused on the processes of justice, Respondent's actions served to undermine public confidence in the impartiality of the Madison County court system.

Conclusion and Imposition of Sanctions

■ After contesting the Commission's charges from the outset and through a full trial, Respondent has now conceded that his conduct violated the Code of Judicial Conduct as found by the masters. He states that he now regrets his failure to follow the law and apologizes to the citizens of Madison County. We consider this contrition, albeit belated, to be a mitigating factor in the consideration of the appropriate sanction.[2] If the conduct described herein represented an isolated incident of judicial misconduct, we might be inclined toward leniency.

But as the masters noted in their report, this is not the first time Respondent has been the subject of the attention of the Commission.

On December 27, 2001, Respondent was publicly reprimanded by this Court. *See In re Fredrick Spencer,* 759 N.E.2d 1064 (Ind.2001). That reprimand was imposed per the agreement of Respondent and the Commission, predicated on an agreed finding that during his 2000 campaign for reelection, Respondent had run television ads that violated Canon 5(A)(3)(d)(i) and Canon 5(A)(3)(a) of the Code of Judicial Conduct.

On December 28, 1999, the Commission issued a "Public Admonition" to Respondent pursuant to Admission and Discipline Rule 25(VIII)(E)(7) for Respondent's role in entertaining and granting an *ex parte* petition for change of custody. The Com-

---

2. Respondent also asks that we consider as additional mitigators the findings that he did not engage in any improper *ex parte* communications in connection with the Doe incident and that he was not motivated to act in the case by any personal, political, or professional relationships with the parents of the juveniles. The failure to commit other violations of the Code of Judicial Conduct is not a mitigating circumstance.

mission concluded that Respondent had violated Judicial Canons 1, 2, 3(B)(2), and 3(B)(8).

On October 9, 1997, an investigation into a complaint filed against Respondent culminated with a private letter to Respondent. Although Respondent continues to contest the Commission's conclusions, the letter advised Respondent that he had violated Canons 1, 2(A), and 3(B)(5) and that his conduct implicated considerations under Canon 3(B)(8) concerning *ex parte* communications.

These prior acts of misconduct are aggravating factors that cannot be ignored. We concur in the recommendations of the masters as to the appropriate sanction to be imposed. The Respondent herein, Fredrick R. Spencer, Judge of the Madison Circuit Court, is suspended from that office without pay for a period of thirty days. The suspension will go into effect at a date to be decided in consultation among Respondent, Counsel to the Commission, and the Executive Director of State Court Administration, but must commence no later than thirty days from the date this opinion is certified as final. Further, the costs of the proceeding are assessed against Respondent.

All Justices concur.

SHEPARD, C.J. also concurs with separate opinion.

SHEPARD, Chief Justice, concurring.

I join in the opinion of the Court and write separately only to state the rather straightforward proposition that a judicial officer who facilitates judge-shopping does damage to the impartiality of the judiciary and violates the Canons.

We have made this point before. In a recent case, lawyers who did not care for a ruling received down the hall filed a habeas petition in a different court seeking to get relief from an order of incarceration. The judge who entertained the habeas petition (without notice, it might be added, as in this case) was, of course, a general jurisdiction judge with subject matter jurisdiction to hear habeas petitions. We disciplined the judge because he had no business participating in a case already underway in another courtroom. *Matter of Johnson,* 715 N.E.2d 370 (Ind.1999).

The situation before us is roughly the same. Allowing such manipulation rightly leads to public cynicism about whether the judiciary is impartial, and we judges should not be party to it.